1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JASON DANIEL McROBERTS,

     Plaintiff,


    v.


NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

     Defendant.

**1:16-cv-86 GSA**

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JASON McROBERTS AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY**

**I.**    **INTRODUCTION**

    Plaintiff Jason McRoberts ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplemental Social Security Benefits pursuant to Title XVI of the Social Security Act. The

---

[1] Pursuant to Fed. R. Civ. Pro. 25(d), Nancy A. Berryhill shall be substituted in for Carolyn W. Colvin, as Nancy A. Berryhill is now the acting Commissioner of Social Security.

matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] (*See,* Docs. 10, 14, and 16). Upon a review of the entire record, the Court finds that the decision is not supported by substantial evidence. Accordingly, the Court reverses the agency's determination to deny benefits and grants Plaintiff's appeal in part.

## II.   FACTS AND PRIOR PROCEEDINGS[3]

### A. Background

Plaintiff filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act on February 1, 2008, alleging an onset of disability beginning July 28, 2007. AR 78. On June 9, 2010, after holding an administrative hearing, Administrative Law Judge ("ALJ") Laura Speck Havens issued a decision denying the application. AR 78-89. The Appeals Council upheld that decision on September 23, 2010. AR 95-97. This decision was not appealed to district court.

On March 15, 2012, Plaintiff filed a second application for SSI alleging disability beginning on the date of filing. AR 199-205. The application was denied initially and again on reconsideration after which Plaintiff requested a hearing before an ALJ. AR 136-40; 146-50; 153-55. A hearing was held on September 18, 2014 in Stockton, California before ALJ Evangelina P. Hernandez. AR 42-74; 97-98. On December 9, 2014, ALJ Hernandez issued a written decision finding that although the *Chavez* presumption of continued non-disability had been overcome in light of evidence of changed circumstances, Plaintiff nonetheless retained the capacity to perform a reduced range of light work, and was therefore not disabled.[4] AR 24-36. Plaintiff requested that the Appeals Council review the ALJ's unfavorable decision, submitting additional medical evidence and legal arguments in support of his claim. AR 19; 683-714; 332-37. On November 20, 2015, the Council denied the appeal, making that decision the final decision of the Commissioner. Plaintiff sought judicial review by commencing the instant action pursuant to 42 U.S.C. §§

---

[2] The parties consented to the jurisdiction of the United States Magistrate Judge. (*See* Docs. 4 and 6).

[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[4] The principals of res judicata apply to administrative decisions and in order to overcome the presumption of continuing non-disability arising from a prior ALJ's findng of non-disability, a plaintiff must prove "changed circumstances" indicating a greater disability. *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988). A changed circumstance includes a change in the claimant's age category under 20 CFR 416.963, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not previously considered, or a change in the criteria for determining disability. Acquiescence Ruling 97-4(9).

2

405(g), 1383(c)(3).

**B. Summary of the Medical Record**

The Court has reviewed the entire medical record. AR 338-714. The summary below focuses on Plaintiff's psychological condition as this is the most relevant for purposes of this appeal.

### 1. Plaintiff's Treatment at Stanislaus County Behavioral Health

On January 31, 2012, Plaintiff began treatment at Stanislaus County Behavioral Health and Recovery Services ("County Behavioral Health") after his probation officer referred him for a mental health assessment. AR 369-73. Plaintiff was evaluated by a licensed social worker. At that time, Plaintiff reported symptoms of depression, including feelings of sadness, hopelessness, worthlessness, disrupted sleep, irritability, frustration, poor concentration, and intermittent thoughts of suicide. AR 369. He admitted that he recently burned himself and that he "sticks pins in his arms." AR 369. He had "given up on life" and had lost fifteen pounds in the preceding few months. AR 369. He also made "unusual statements" including that "he is stuck magnetically to the ground [and] he can't leave his house at times" AR 373. He also felt that he was a puppet and that someone else was controlling him. AR 373.

Plaintiff also reported a long history of substance abuse including using cocaine, marijuana, and methamphetamine, although he stated he had not used methamphetamine or marijuana for fourteen months or cocaine in several years. AR 373. During school, he was enrolled in special education classes due to a learning disability and attention deficit and hyperactivity disorder ("ADHD") and quit school in the eleventh grade. AR 373. He reported that he had been physically abused by his parents as a child. AR 370. He also had a history of multiple arrests (20 +) and was currently on probation until 2016. AR 373. Relatedly, he completed domestic violence classes three times in the past, and was ordered to begin another class in February 2012. AR 373.

A mental status examination revealed a suspicious attitude, a dysphoric mood, diminished sleep, self-mutilation in the form of burning himself, reports of auditory hallucinations, fair concentration, impaired remote memory, below average intellectual function, poor judgment, poor impulse control, and feelings of helplessness and worthlessness. AR 371. He was provisionally diagnosed with major depressive disorder with psychotic features,

methamphetamine dependence in full remission, cluster B traits, and the need to rule out bipolar disorder, with a GAF of 50.[5] AR 372.

On March 5, 2012, Plaintiff was examined by staff psychiatrist Dr. Tomonori Fukui, M.D. at County Behavioral Health. AR 429-430. Plaintiff reported hearing voices that "talk about [him] all day long" and reported that he gets paranoid around others. AR 429. The hallucinations and paranoia had worsened since running out of his medications about a month-and-a-half ago. He also suffered from anxiety. AR 429. Plaintiff reported two prior psychiatric hospitalizations, a history of overdosing with crystal methamphetamine, a history of methamphetamine use from the age of seventeen until a the age of thirty-seven, a history of cannabis dependence from age sixteen until the age of nineteen, and opioid medication abuse until four years ago. AR 429. However, Plaintiff reported being "clean for 14 months." AR 429. By way of history, Plaintiff reported being married for nineteen years and that he had multiple incarcerations with more than "fifteen [sic] in the jail" and forty-two months in prison. AR 429.

A mental status examination on that day revealed a kempt appearance; cooperative behavior; fine mood; broad affect; oriented times four; cognition and concentration intact; auditory hallucinations and paranoid thoughts; and fair insight and judgment. AR 430. Dr. Fukui diagnosed paranoid schizophrenia; a history of polysubstance abuse; and antisocial personality disorder; with a current GAF of 55.[6] AR 430. Plaintiff was prescribed Haldol (to treat his hallucinations), Cogentin (to treat involuntary movements caused by the Haldol), and Ativan (for anxiety). AR. 358, 430.

On March 30, 2012, social worker Debra Taylor assessed Plaintiff and developed a treatment plan. She identified his "target problems" as auditory and visual hallucinations, anxiety, paranoia, poor anger management, and lack of empathy. AR 360. It was again noted that Plaintiff had spent forty-two months in prison, had been in jail multiple times, and had a history

---

[5] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed.1994) ("DSM-IV"). A GAF between 41 and 50 "is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 32.

[6] A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV, 34.

of domestic violence. AR 359. His wife was encouraged to attend co-dependency support groups. AR 359. The treatment plan required that Plaintiff meet with a case manager one to two times per month for support and education for the next year. AR 360. Ms. Taylor assessed Plaintiff's GAF at 50 and diagnosed him with chronic paranoid schizophrenia, methamphetamine dependence in full remission, and antisocial personality disorder. AR 359. Plaintiff's goals were to learn how to reality test, learn coping skills for anxiety, complete anger management, and identify the feelings of others. AR 360. It was noted that Plaintiff was at a high risk for decompensation without intense case management. AR 359. Plaintiff's prescriptions for Ativan, Cogentin, and Haldol were ordered refilled in April and May of 2012. AR 358.

On April 3, 2012, Plaintiff reported to Dr. Fukui that he "hears many voices" but he had not filled his prescriptions because he was unable to afford the co-payment. AR 431. He noted that he had spent four days of the preceding week in jail before a three-day stay in outpatient treatment. AR 431. On examination, Dr. Fukui reported that Plaintiff's auditory hallucinations were not affecting his behavior and that he was not experiencing visual hallucinations or delusions. AR 431. Plaintiff restarted his medications. AR 431.

During a May 2, 2012 visit with Dr. Fukui, Plaintiff reported sleeping from 5:00 a.m. to 9:30 a.m. and noted that he then naps for four hours during the day. AR 380; 433. He "hear[s] a little bit of [his] sister's voices." AR 380; 433. He had not filled the Cogentin prescription "because he could not afford it." AR 380; 433. Dr. Fukui noted that Plaitniff's auditory hallucinations were "not affecting his mood or behavior." AR 380; 433. An examination revealed euthymic[7] mood, no visual hallucinations or delusions, no suicidal or homicidal ideology, oriented times four, and no reported medication side effects. AR 380; 433. Plaintiff's prescription for Congentin, Ativan, and Haldol was continued. AR 358; 380; 433.

On June 5, 2012, Plaintiff reported hearing "4 to 5 voices" that "get louder around 3:30 p.m." He also indicated that he had been sober for fifteen months and that he sleeps from 3:00 a.m. to 7:30 a.m. AR 435. Dr. Fukui noted auditory hallucinations, a euthymic mood, no suicidal or homicidal ideation, and no side effects from the medication. AR 435.

On July 3, 2012, Plaintiff told Dr. Fukui that he had been staying in a motel for the preceding four days and that the voices were still "ask[ing him] questions." AR 436. He admitted

---
[7] Euthymia is defined as a normal, tranquil mental state or mood. www.merriam-webster.com/medical/euthymia.

to smoking marijuana a couple of days earlier but otherwise he takes care of himself. AR 436. On examination, Dr. Fukui again noted auditory hallucinations, a euthymic mood, no suicidal or homicidal ideation, and no side effects from medications. AR 436. He also noted that Plaintiff's auditory hallucinations were not affecting his mood or behavior. AR 436.

On August 17, 2012, Plaintiff reported, "I still hear all kinds of things, but I control myself." AR 437. He indicated that had been "in a transitional living" arrangement for the preceding month. AR 437. Dr. Fukui indicated that the auditory hallucinations were not affecting Plaintiff's mood or behavior. AR 437. Dr. Fukui increased Plaintiff's dosage of Haldol. AR 437.

On September 28, 2012, Plaintiff reported that the voices had been "less loud" but that he only sleeps from 2:00 a.m. or 4:00 a.m. until about 7:00 a.m. and watches TV all night long. AR 439. He reported increased energy with "more thoughts in the night" and was visiting with friends during the day. AR 439. Dr. Fukui reported that Plaintiff's hallucinations were not affecting his mood or behavior, and Plaintiff presented with a euthymic mood. AR 439. Depakote was added to Plaintiff's prescription regimen. AR 439.

In November of 2012, Plaintiff indicated that he was seeing shadows that disappear after a second, and he was still hearing voices that wake him up in the night. AR 438. He reported that he was sleeping from 9:00 p.m. until 6:30 a.m. Plaintiff presented with a euthymic mood, denied delusions, suicidal or homicidal ideation, and was oriented times four. Dr. Fukui increased Plaintiff's Haldol dosage. AR 438.

During a follow-up with Dr. Fukui on January 2, 2013, Plaintiff reported not sleeping the night before because he ran out of Depakote and Ativan four days previously, and he did not have money for the co-payment. AR 440. He was still seeing shadows of people passing by for a few seconds, but he had not been hearing voices for the preceding two weeks. AR 440. His hallucinations were still not affecting his mood, which was euthymic. AR 440. He denied delusions and suicidal and homicidal ideation. AR 440.

On February 7, 2013, Plaintiff reported hearing "a little bit of voices" but that he was "O.K." AR 441. Dr. Fukui noted less auditory hallucinations and paranoia, no suicidal or homicidal ideation, and Plaintiff was oriented times four. AR 441. His medications were continued without adjustment AR 441.

By April of 2013, Plaintiff reported seeing more shadows than hearing voices, but he

admitted to not having the money for the co-payments for his medications aside from the Cogentin and Depakote. AR 442. Plaintiff reported he had moved into a new house. Examination revealed a mild tremor in his hands, and Dr. Fukui noted that Plaintiff's auditory and visual hallucinations were not affecting Plaintiff's mood or behavior. AR 442. Plaintiff presented with a euthymic mood, denied delusions and suicidal and homicidal ideation, and was oriented times four. Cogentin as needed was added to Plaintiff's prescription regimen. AR 442.

On May 30, 2013, Plaintiff stated, "I heard voices [sic] told me to jump into the ocean, of course, I would not do that." He also reported "seeing rocks" but that he was taking care of himself and was cleaning his house. AR 443. Dr. Fukui indicated Plaintiff's auditory and visual hallucinations were not affecting his mood or his behavior. Plaintiff was oriented times four, had a euthymic mood, and denied suicidal and homicidal ideation. AR 443.

On September 19, 2013, Plaintiff reported hearing "weird" voices telling him "to burn things," but he was able to "control[ ] himself against the voices." AR 444. He had also been sleeping poorly for the previous four nights "feel[ing] like that somebody is outside of the door." AR 444. He reported that he missed his prior appointment for a Haldol injection and had not taken an injection since July of 2013. AR 444. Dr. Fukui noted Plaintiff had auditory hallucinations and delusions/paranoia which were not affecting his behavior or mood which he described as euthymic. AR 444. Plaintiff was oriented times four and denied suicidal or homicidal tendencies. AR 444.

At his October 2013 session, Plaintiff again admitted to missing the last appointment for a Haldol injection, reporting that the voices had been telling him to "go outside." AR 445. He was still "control[ing] himself against the voices," and had taken care of himself. AR 445. Dr. Fukui noted Plaintiff had auditory hallucinations which were not affecting his mood or behavior, Plaintiff denied visual hallucinations, had a euthymic mood, was oriented times four, and denied suicidal or homicidal ideas or plans. AR 445.

In December of 2013, Plaintiff reported hearing "three or four voices talking to [him]" but that he had last received his Haldol injection on October 31, 2013, which was overdue. AR 446. He was trying to control the voices by watching TV or smoking cigarettes, and was taking care of himself. AR 446. Dr. Fukui reported noted auditory hallucinations were not affecting his mood or behavior. Plaintiff had a euthymic mood, denied visual hallucinations, and denied suicidal and

homicidal hallucinations. AR 446.

On December 12, 2013, Dr. Fukui completed a Psychiatric/Psychological Impairment Questionnaire and noted he had been treating Plaintiff since March of 2012 for paranoid schizophrenia. AR 402-408. He described Plaintiff's primary symptoms as auditory hallucinations, delusions, paranoia, and anxiety, with his symptoms having necessitated two inpatient hospitalizations in the past. AR 404. Dr. Fukui found Plaintiff to be markedly limited (defined as essentially precluding the given activity (AR 404)) in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance; to sustain ordinary routine without supervision; to work in coordination with or proximity to others; to be aware of normal hazards and take appropriate precautions; to travel to unfamiliar places; to set realistic goals; and to make plans independently. AR 405-406. He added that work or work-like settings would cause Plaintiff to deteriorate due to the severity of his auditory hallucinations; that he would be incapable of tolerating even a "low stress" work environment; and that he would likely miss more than three workdays per month due to his impairments. AR 407-408.

In a January 23, 2014 follow-up with Dr. Fukui, Plaintiff reported he did not receive his Haldol injections due to his lack of funds, but he recently learned that the co-payment had been waived. AR 447. He was again seeing shadows for a few seconds and was still hearing voices but he was not understanding what they are saying. AR 447. He was still "controlling himself against the voices." AR 447. Dr. Fukui reported auditory hallucinations which were not affecting Plaintiff's mood or behavior. Plaintiff had no suicidal or homicidal ideation, presented with a euthymic mood, and was oriented times four. AR 447

On March 20, 2014, plaintiff was seen by psychiatrist Dr. Walter Lampa at County Behavioral Health. Plaintiff reported that he had been in jail for seven days and had been off of his medications during that time but had resumed them the day before. AR 458. He was in a "bad mood" with poor sleep, okay appetite, and was again hearing voices, most recently the day before. AR 458. A mental status exam revealed a self-reported "bad" mood with a full range of affect and good insight and judgment. AR 458. Plaintiff had no suicidal or homicidal ideation, no delusions, and his thought process was linear. AR 458. Plaintiff continued on Haldol injections, Cogentin, Depakote, and Ativan. AR 458.

In av April 3, 2014 follow-up with Dr. Lampa, Plaintiff again reported an "okay" mood, that he was sleeping less than eight hours per night, and that he continued to have auditory hallucinations consisting of voices commenting on his actions. AR 457. A mental status examination revealed Plaintiff's mood was congruent, that he had good hygiene, had no delusions, had a linear thought process, possessed good insight and judgment, and that he denied suicidal and homicidal ideation. AR 457. The Haldol dosage was increased due to "breakthrough auditory hallucinations during the day." AR 457.

On April 10, 2014, Dr. Fukui completed another Mental Impairment Questionnaire. AR 448-452. Dr. Fukui again affirmed Plaintiff's diagnosis of paranoid schizophrenia with a current GAF of 51, noting Plaintiff's most significant symptom was auditory hallucinations. AR 448; 450. Dr. Fukui found Plaintiff had "marked" limitations (defined as interfering with the given activity more than two-thirds of an eight-hour workday (AR 451)) in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to sustain ordinary routine without supervision; to work with others; to make simple work-related decisions; to complete a workday without interruptions from psychological symptoms; to perform at a consistent pace without rest periods of unreasonable length or frequency; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers; to respond appropriately to workplace changes; to be aware of hazards and take appropriate precautions; to travel to unfamiliar places; to set realistic goals; and to make plans independently. AR 451. He opined that Plaintiff would likely miss work more than three times per month, and that his limitations would apply as far back as June of 2010. AR 452. In a form dated April 10, 2014, Dr. Fukui also affirmed that Plaintiff was not using drugs or alcohol and he remained disabled. AR 453.

On April 10, 2014, the same day as he completed the health forms, Dr. Fukui had another follow-up appointment with Plaintiff. At that time, Plaintiff was still hearing "many different people's voices" despite having last taken Haldol by injection on March 10, 2014. AR 456. Plaintiff's next Haldol dosage was accelerated, to be taken the next day. AR 456. Dr. Fukui noted Plaintiff denied delusions, had a euthymic mood, denied suicidal or homicidal ideation, and was oriented times four. AR 456.

On May 22, 2014, Plaintiff reported to Dr. Fukui that he was still hearing voices but that

9

he doesn't respond to them. He was still getting paranoid but he was "all right." AR 455. He reported that, "he ha[d] been controlling himself against" the voices and the paranoia. AR 455. Dr. Fukui noted that Plaintiff's auditory hallucinations and delusional thoughts/paranoia were not affecting his behavior, that Plaintiff had a euthymic mood, his insight and judgment were good, he was oriented times four, and that he denied suicidal and homicidal ideation. AR 455.

Plaintiff continued to be treated by Dr. Fukui from July 2014 through December 2014. AR 682; 705-707. During this time, he missed two appointments that were rescheduled. AR 705; 707. Throughout this time period, Plaintiff was experiencing auditory hallucinations and was paranoid but reported that he controlled himself against them. AR 706; 708. During this time, Dr. Fukui noted Plaintiff had a euthymic mood, denied suicidal or homicidal ideation, had good insight and judgment and was oriented times four. AR 706; 708. Dr. Fukui added Seroquel (for schizophrenia) as needed to Plaintiff's prescription regimen. AR 708.

Plaintiff saw Dr. Beatrice Saint Claire M.D., from February through April 2015 at County Behavioral Health. AR 709-712. During this time, Plaintiff appeared stressed as he was advised that he and his family would need to move out of their apartment. AR 709. However, the stress decreased once his living environment stabilized. AR 710. During this period, Plaintiff had racing thoughts and saw shadows but the Seroquel helped him sleep and was increased during this period. AR 709; 710; 712. In April 2015, Plaintiff reported he was disturbed by voices which were talking to each other and commenting about him. AR 712. Despite these complaints, he was pleasant and cooperative, had a euthymic and slightly anxious moods, had organized thought processes, and no suicidal or homicidal tendencies. AR 710; 712.

Dr. Ronald Blustein, M.D. at County Behavioral Health, performed a psychiatric evaluation on May 12, 2015. AR 713- 714. Dr. Blustein noted Plaintiff presented with paranoid anxiety with some mild anger issues and moderately severe depression. AR 713. Plaintiff was sleeping seven to eight hours a night. A mental status examination revealed Plaintiff had a euthymic mood, he was cooperative and interactive, oriented times three, had intact memory, steady attention, was alert, had organized linear thinking, fair judgment and insight, but that his delusions and hallucinations were more evident. Plaintiff's Seroquel was increased. AR 713-714.

///

///

### 2. Dr. Surulinathan, M.D., Examining Psychiatrist

On March 20, 2012, Plaintiff underwent psychiatric evaluation by Dr. Sanmukan Surulinathan, M.D. at the Doctor's Medical Center of Modesto after having been released from a several-day term in the county jail. AR 341-342. Plaintiff reported hearing voices "all the time" and was experiencing paranoia, stating that he did not even trust himself. AR 341. He had a history of two psychiatric hospitalizations: one in December of 2009 and the other in October of 2010 and was diagnosed with depression, polysubstance abuse, and antisocial personality disorder. AR 341. After admission, Plaintiff was given Haldol for psychosis and Trazodone. After evaluation by Dr. Surulinathan, Cogentin was added for extrapyramidal symptoms,[8] along with Ambien for sleep. AR 341. He was discharged the following day with a diagnoses of brief psychotic disorder, amphetamine abuse, and antisocial personality disorder traits, with a GAF of 50 currently - no higher than 20 in the preceding year. AR 341. Plaintiff's prognosis was fair if he remained abstinent from illicit street drugs and if he was complaint with his psychiatric medications. AR 342.

### 3. Dr. Gauch, Ph.D., State Agency Examining Psychologist

On July 14, 2012, Dr. Gerardine Gauch performed a psychological evaluation at the request of the state agency. AR 384-389. Dr. Gauch acknowledged having reviewed Plaintiff's written questionnaires, as well as Dr. Surulinathan's discharge summary from March of 2012. AR 384.

During the evaluation, Plaintiff reported that he hears voices and talks back to them; that the voices tell him to do things "like clean the kitchen;" that he can hold a conversation with someone for thirty to forty seconds before the voices in his head interfere; that during the present evaluation, the voices were telling him to "push forward and pull backward" but he did not know what that meant; that some of the voices are of deceased relatives; that he is "very anxious" and "cannot stay still for any length of time," and that he only sleeps four to five hours at night. AR 384-385.

He reported he had been psychiatrically hospitalized in 2007 and again in 2012 as a

---

[8] Extrapyramidal symptoms are physical symptoms, including tremors, slurred speech, akathesia, dystonia, anxiety, distress, and paranoia that are associated with improper dosing of or unusual reactions to antipsychotic medications. *See*, www.medicinenet.com.

danger to himself and others. AR 385. He tried to kill himself twice, once in 1990 and again in 2001. AR 385. He was currently taking Haldol, Lorazepam, and Cogentin. AR 385.

A mental status examination revealed reports of hearing voices with an awareness of what they were saying, a dysthymic mood with congruent affect, poor sleep, recall of two out of three items after a several minute delay, a two-year discrepancy in the reporting of his age, one mistake in a series of serial threes, a lack of understanding of why food is refrigerated, an inability to perform a multiplication problem, limited abstract thinking, limited judgment and insight, a lack of friends, and a history of physical altercations, most recently in a domestic violence setting. AR 386-388.

Dr. Gauch's diagnosed Plaintiff with psychotic disorder, amphetamine-induced psychotic disorder with hallucinations, cannabis abuse, and had a current GAF of 55. AR 388. She found no evidence of exaggeration or inconsistencies. AR 388. She opined that Plaintiff's symptoms severity were in the "moderate" range, that he had a "fair" chance of improving over the next year. He also had a fair attitude toward seeking employment in light of his poor work history. AR 388. She found Plaintiff's ability to deal with work setting changes to be "poor" and that he had a "fair" ability to understand and remember detailed instructions; to maintain concentration and attention; to accept instructions and respond appropriately to a supervisor; to complete a normal workday and workweek without interruptions; and to interact with co-workers. AR 389.

### 4. Dr. Antoinette Acenas, M.D., State Agency Examining Psychiatrist

On October 25, 2013, Dr. Antoinette Acenas completed a consultative psychiatric assessment at the request of the state agency. AR 398-401. Dr. Acenas was provided with a copy of Dr. Gauch's report and an internal physical medical evaluation completed by Dr. Wagner. AR 398. Dr. Acenas noted Plaintiff's history of auditory hallucinations including telling him to do things "both bad and good," that he sees "shadows" from the corners of his eyes, that he had been admitted for inpatient hospitalization in the preceding year due to suicidal ideation. He indicated that he had been taking Lorazepam, Depakote, Haldol, and Benztropine AR 398. Plaintiff also reported that he started using methamphetamine and alcohol at the age of seventeen, had been in rehabilitation twice, and had been sober for the preceding eighteen months. AR 399.

A mental status examination revealed reports of both auditory and visual hallucinations, a depressed mood with appropriate affect, and recall of only one of three objects after a three-

minute delay. AR 399-400. Dr. Acenas' diagnosed methamphetamine induced psychosis and history of methamphetamine abuse with a current GAF of 60. AR 400. She found Plaintiff's ability to understand and follow simple instructions was not impaired; however, he was "moderately impaired" in his abilities to follow complex, detailed instructions; to maintain an appropriate level of concentration, pace, and persistence in performing one- or two-step simple tasks; to maintain adequate pace and persistence in performing complex tasks; to tolerate the usual stresses and pressures of day-to-day work activities; and to manage changes in routine work situations. AR 400-401.

### 5. Drs. P.M. Balson and Paul Klein, Non-Examining State Agency Doctors

Dr. P.M. Balson and Paul Klein, PsyD, reviewed the medical record related to Plaintiff's psychological condition on August 8, 2012. Both doctors opined that *Chavez* applied and that there had been no new circumstances. AR 103-105; 108-110. The doctors adopted the previous ALJ's RFC and opined that Plaintiff could perform simple repetitive tasks with limited public contact. AR 110; 130.

### C. Plaintiff's Testimony

Plaintiff was thirty-seven years old at the age of onset of his disability on March 15, 2012, and he was forty years old as of the date of the most recent administrative hearing. AR 46, 199. He has an eleventh grade education. AR 71. He last worked about fifteen years ago as a cashier at Kentucky Fried Chicken in San Jose. AR 46. The job only lasted a month-and-a-half, however, because he was struggling with his "mental stability." AR 46-47. He has been taking psychotropic medications including Depakote, Ativan, Cogentin, and Haldol for the preceding thirty-six months, and they do seem to help, albeit to an unspecified degree. AR 47-48.

Despite taking these medications, he still experiences paranoia, grinding of his teeth, and a tendency to "go off on people" for "no reason." AR 48. He believes that people are talking about him "because they look at [him] and then they sit there and they laugh." AR 56. He still hears voices, approximately every other day, despite taking his medications. AR 50. The voices tell him "to hurt people," and he doesn't "want to hurt anybody." AR 51. He also has visual hallucinations, seeing shadows in his peripheral vision "a lot." AR 51. He last got into an argument with a stranger about six months ago. AR 57. He contemplates suicide and was once admitted to the behavioral health center for threatening suicide. AR 57. His psychiatrist increased

13

the dosage of his medication, which has helped reduce the auditory hallucinations "a little bit." AR 57. He has difficulty sleeping because his medications keep him awake at night, sometimes until about 3:00 a.m. or 4:00 a.m. before he finally falls asleep. AR 52. He sleeps during the day. AR 54. He has a history of methamphetamine abuse but last used that drug about four years ago before completing a rehabilitation program. AR 47. He does not drink alcohol. AR 52.

In addition to his psychiatric impairments, Plaintiff suffers from back pain. AR 59-60. He had undergone epidural injections, which helped for six months to a year before the pain returned. AR 60. As a result of his back pain, he cannot perform household chores such as vacuuming, but he does take out the trash as long as he avoids lifting more than about fifteen pounds. AR 60-61.

Plaintiff also has a history of seizures, the most recent one having occurred the week before, and the previous one about two weeks prior to that. AR 61-62. He stopped taking the anti-seizure medication because of a lack of medical insurance. AR 62. He was unclear whether he had been hospitalized for a seizure in the preceding two years. AR. 63.

Plaintiff lives with his wife of twenty-two years. AR 49. He doesn't leave the house very often, only about three or four times a month in order to attend his group sessions or to go to the grocery store. AR 49. He tends to go in the midafternoon because there are "less people out in the world" at that time. AR 49. He gets easily frustrated, even when using his payment card in the store as he often forgets his access code. AR 50. He does not engage in any activities or attend religious services outside the home. AR 51. He sometimes goes out to breakfast with his wife, but he has few difficulties at the restaurant because they "know everybody there." AR 52. He does not have access to cable or satellite TV, so he just watches movies on his VCR. AR 54. He sometimes has difficulty remembering or understanding what he is watching. AR 54. He used to read adventure books but stopped reading after he was released from jail. AR 55. He believes he would not

be able to perform a job even where that job did not require working with anyone else because he "can't concentrate." AR 58. He tried to work on a volunteer basis at a church lifting heavy "stuff" and packing bags, but he could not perform that work because he would forget the instructions, and he was "getting in trouble for that." AR 58-59.

///

///

14

### III.    THE DISABILITY STANDARD

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
> 42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. § 416.920(a).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. § 416.920 (a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20 C.F.R. § 416.913.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability; (2) whether the claimant had medically-determinable "severe" impairments;  (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work;  and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level. 20 C.F.R. § 416.920(a)(4).

### IV.    SUMMARY OF THE ALJ'S DECISION

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 24-36.  More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 15, 2012, the alleged date of onset. AR 26. Further, the ALJ identified the following severe impairments: degenerative disc disease, seizure disorder, affective disorder, anxiety disorder, personality disorder, and schizophrenia. AR 26.  However, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listing impairments in 20 C.F.R. Part 404 P, Appendix 1. AR 27-29.

The ALJ also determined that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of light work as defined in 20 CFR § 416.967(b) except that he is limited to frequent pushing or pulling; he can never climb ladders, ropes, or scaffolds; he can occasionally stoop or crouch; he is limited to frequent overhead reaching; he must avoid concentrated use of hazardous machinery and avoid concentrated exposure to unprotected heights. The ALJ also limited Plaintiff to simple work which she defined as having only occasional decision making and only occasional changes in the work setting. Plaintiff cannot have any interaction with the general public and can have only occasional interaction with co-workers. AR 29-34.

At step four, the ALJ found Plaintiff had no relevant past work. AR 34. However, at step five, she found that Plaintiff is capable of performing work as a marker, a mail sorter and a router. AR 34-35. Accordingly, the ALJ found that Plaintiff was not disabled. AR 35.

**IV.**     **THE ISSUES PRESENTED**

Plaintiff challenges the ALJ's decision arguing that the ALJ committed error by granting little weight to the mental function assessments of treating psychiatrist, Dr. Fukui or examining psychiatrist Dr. Acenas. (Doc. 10, pgs. 18-25; Doc. 16, pgs. 2-3) Plaintiff also contends that the ALJ improperly found him not credible. (Doc. 10, pgs. 26-29; Doc. 16, pgs. 3-4). Plaintiff requests that the case be remanded for an award of benefits, or alternatively, that the case be remanded for further proceedings. The Commissioner contends that the ALJ's assessment of the medical record and her credibility evaluation were proper and supported by substantial evidence. (Doc. 14, pgs. 6-14).

**V.**     **THE STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether (1) it is supported by substantial evidence, and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). It is "relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Id.*

## VI.     DISCUSSION

### A.  The ALJ's Evaluation of the Medical Evidence was Proper.

Plaintiff argues that that ALJ improperly assessed the medical evidence. Specifically, she contends that the ALJ erred by giving little weight to Dr. Fukui or Dr. Acenas' opinions, and that the limitations assessed by both of these doctors are incompatible with full-time work at any exertional level. (Doc. 10, pgs. 18-25; Doc. 16, pgs. 2-3). He further argues that Dr. Acenas' limitations which were adopted by the ALJ, are not reflected in the RFC. (Doc. 16, pg. 3). The Commissioner contends that substantial evidence supports the ALJ's rejection of Dr. Fukui's opinion, and that the ALJ accepted Dr. Acenas' opinion and properly incorporated those limitations into the RFC finding. (Doc. 14, pgs. 6-11).

#### 1.  Legal Standard

The weight given to medical opinions depends in part on whether they are offered by treating, examining, or non-examining (reviewing) professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may reject the uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Ghanim v. Colvin*, 763 F. 3d 1154, 1161 (9th Cir. 2014); *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Ghanim*, 763 F. 3d at 1161; *Lester*, 81 F.3d at 830. While a treating professional's opinion is generally accorded superior weight, if it is contradicted by an examining professional's opinion (when supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995), citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152 (9th Cir. 2001), but the ALJ need not give it any weight if it is conclusory and supported by minimal clinical findings. *Bray v. CSS*, 554 F. 3d 1219, 1228 (9th Cir. 2009);

*Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751.

Here, when evaluating the medical evidence, the ALJ gave great weight to Dr. Acenas', Dr. Balson's, and Dr. Klein's opinions. AR 32-33. She gave Dr. Gauch's opinion little weight with regard to Plaintiff's mental and social limitations especially in the areas of concentration and in social functioning. AR 33. However, she gave great weight to Dr. Gauch's assessment that Plaintiff's had a poor ability to deal with changes in the work setting. AR 33. Finally, she gave little weight to Dr. Fukui's opinion (Plaintiff's treating physician). Plaintiff argues that the ALJ improperly rejected Dr. Fukui's opinion.

### a. The ALJ's Rejection of Dr. Fukui's Opinion is Supported by Substantial Evidence.

The ALJ summarized Dr. Fukui reports noting that he opined Plaintiff would be unable to work because he had marked limitations in understanding and memory; in sustained concentration and persistence; social interactions; and adaptation. AR 33-34; 402-408; 448-452. Because there were contradictory medical opinions, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Fukui's opinion. *Ghanim*, 763 at 1161; *Lester*, 81 F.3d at 830. The ALJ gave Dr. Fukui's opinions little weight for the following reasons: 1) the opinions were largely inconsistent with the medical evidence that the Plaintiff had a greater capacity for understanding and following instructions, interacting with others, maintaining attention, concentration, persistence, and adapting; 2) although Plaintiff experienced auditory hallucinations and paranoid thoughts, he consistently reported that the hallucinations did not affect his mood and that he had learned to control the voices; 3) Plaintiff reported that his medications are effective and helpful; 4) Plaintiff's mental status evaluations were largely normal; 5) Plaintiff was able to attend regular medical appointments and there is no objective evidence that he cannot sustain a routine or attend work consistently or reliably; 6) Dr. Fukui did not offer any support for the difficulties in the identified areas, and his treatment notes indicated that Plaintiff is doing relatively well on his medications; and 7) any final determination of disability is reserved for the Commissioner. After reviewing the record, the Court finds that the above reasons are specific and legitimate and are supported by substantial evidence.

First, the ALJ identified the objective evidence she believed supported the degree of limitations Dr. Fukui assigned. AR 31; 33. For example, Dr. Gauch's objective testing indicated

that Plaintiff was capable of greater attention and concentration than what Dr. Fukui opined. AR 31; 33. Plaintiff was able to recall 3/3 items immediately and 2/3 items spontaneously after several minutes and demonstrated no problems with his general fund of knowledge. AR 31; 33; 387. Furthermore, Plaintiff could perform simple calculations and completed a six number string of serial 3s. AR 31; 33; 387. Similarly, Dr. Acenas noted that Plaintiff could perform serial 3s, could spell WORLD backwards and forwards, and was able to engage in abstract and comparative thinking. AR 400. These findings are contrary to Dr. Fukui's opinion that Plaintiff would be markedly limited in maintaining attention and concentration or in sustaining an ordinary routine. AR 451. Both of these doctors also opined that Plaintiff had higher functioning than what Dr. Fukui had assessed in these areas, and as discussed below, the ALJ afforded theses opinions more weight. The contrasting opinions between Drs. Gauch and Acenas and Dr. Fukui's reports provided a legitimate basis for the ALJ to reject Dr. Fukui's opinions. AR 33-34. *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999) (inconsistency between two doctors' conclusions regarding claimant's mental functioning "provided the ALJ additional justification for rejecting" one of the conclusions).

Moreover, there is substantial evidence in the record supporting the ALJ's finding that although Plaintiff had hallucinations and paranoia, he did not respond to the hallucinations. AR 33. Throughout Dr. Fukui's treatment, Plaintiff reported that he was hearing voices but that had them under control and that he was able to take care of himself. AR 437 (8/17/12 - hears voices but taking care of self); AR 440 (1/2/13 - sees shadows but is taking care of self); AR 444 (9/1/913 – controlling himself against the voices); AR 446 (12/12/13 - controlling himself against the voices by watching TV or smoking); AR 447 (1/23/14 – controlling voices); AR 455 (5/22/14 - hearing voices but controlling them). Similarly, Dr. Fukui's own notes revealed that Plaintiff's auditory hallucinations were not affecting his behavior.[9] AR 380; 431; 433; 436; 437; 439; 440; 442; 443. Moreover, other than the hallucinations and paranoia, Plaintiff's mental status exams were largely normal. Indeed, Plaintiff presented with a euthymic mood, was oriented times four, had good insight and judgment and linear thought processes throughout his treatment. AR 429;

---

[9] The ALJ indicated that Plaintiff stated the hallucinations were not affecting his behavior. However, the Court interprets the doctor's notes to reflect that it was the doctor drawing these conclusions since these statements were made under the section notated "O" for objective assessments and other diagnostic impressions were given there. It appears Plaintiff's reported symptoms were listed under the "S" section for subjective complaints.

433; 435; 436-438; 440-444; 457-458. Although Plaintiff argues that his mental status exams were not largely normal because he had extensive hallucinations, the ALJ did not err in this regard because she clearly recognized the severity of the hallucinations but found that they were under control. AR 31-32.

Finally, the ALJ noted that Plaintiff was complaint with his medications, attended his appointments regularly, and that both he and Dr. Fukui's notes indicated that the medications were effective in stabilizing Plaintiff's condition. AR 31. This conclusion is supported by the treatment notes because for the most part, Plaintiff was compliant with his medications and saw significant improvement while being treated. AR 429-457. Although Plaintiff notes that he had a history of being incarcerated, these incidents decreased significantly when Plaintiff was taking his medications. AR 431; 458 (Plaintiff arrested on two occasions during treatment but was released and stabilized after he resumed his medications). Although Plaintiff interprets the record differently, the ALJ's assessment of the facts is reasonable. Although evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to the claimant, if the ALJ's interpretation of evidence was rational, as it was here, the Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005). Thus, these are specific and legitimate reasons that are supported by substantial evidence for rejecting Dr. Fukui's findings. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (after discussing the claimant's medical history and treatments in detail, the ALJ properly found an "incongruity" between the doctor's questionnaire responses and the medical records; for example, the ALJ stated that the doctor's conclusions "did not mesh with her objective data or history").

**B. The ALJ Erred When Formulating the RFC.**

Plaintiff argues that although the ALJ stated that she gave great weight to Dr. Acenas' opinion, these limitations were not reflected in the RFC. Specifically, he argues that limiting Plaintiff to simple unskilled work in a low stress job, with only occasional decision making, and only occasional changes in the work setting did not address Dr. Acenas' moderate limitations in Plaintiff's ability to concentrate when completing one and two-step tasks, the impact of his impaired stress tolerance, and reactivity to workplace changes. (Doc. 16, pgs. 3-4). Defendant contends that the ALJ properly incorporated all of Dr. Acenas' limitations into the RFC. (Doc. 14,

pgs. 9-11).

### 1. *Legal Standard*

A RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p.  The RFC assessment must be based on all of the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment. SSR 96 8p.  In addition, the adjudicator "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe" because such limitations may be outcome determinative when considered in conjunction with limitations or restrictions resulting from other impairments. SSR 96-8p.

An ALJ may pose a range of hypothetical questions to a VE that is predicated on the ALJ's final RFC assessment. However, the hypothetical relied upon must account for all of the limitations and restrictions of the particular claimant. *Bray,* 554 F.3d at  1228. "If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Id.*; *See also, Taylor v. Commissioner of Social Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir.2011) ("Because neither the hypothetical nor the answer properly set forth all of Taylor's impairments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings."); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988) ("Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant . . . .").

Here, the ALJ credited Dr. Acenas' opinion that Plaintiff had moderate impairments in the following areas: an ability to understand and follow complex, detailed instructions; an ability to maintain an appropriate level of concentration, pace, persistence necessary to perform one and two step simple tasks; an ability to maintain adequate pace and persistence to perform complex tasks; an ability to tolerate the usual stress and pressures associated with day-to –day work activities; and an ability to manage changes in routine work situations. AR 32. Plaintiff argues that the ALJ did not properly include these limitations into the RFC.  The Court agrees with the Plaintiff in part.

After adopting these impairments, the ALJ limited Plaintiff to simple, unskilled work,

noting that Plaintiff would need to work in a low stress job with only occasional decision making and only occasional changes in the work setting. AR 32. The Court finds that this RFC addresses Plaintiff's limitations regarding tolerating the stress and pressures associated with work activities, as well as his limited ability to manage changes in the work setting. However, neither the RFC nor the hypothetical the ALJ posed to the VE addressed Plaintiff's moderate limitation regarding the concentration, persistence and pace necessary to perform one and two-step simple tasks, or complex tasks.

Defendant has argued that the ALJ properly translated Plaintiff's limitations into a RFC that addressed Plaintiff's capabilities. She relies on *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008) to support this conclusion. (Doc. 14, pgs. 10-11). The Commissioner further contends that the ALJ relied on Dr. Klein's opinion which was made after Dr. Acenas' report limiting Plaintiff to simple repetitive tasks which the ALJ properly referenced in the decision. *Id*.

There are several problems with the Commissioner's analysis. First, Dr. Klein reviewed the medical record in August 2012 (AR 103-105; 108-110) and did not consider Dr. Acenas' report which was not completed until October 2013, or any of Dr. Fukui's treatment notes. AR 398-401. Moreover, Defendant's reliance on *Stubbs-Danielson* is misplaced. In *Stubbs-Danielson*, the Ninth Circuit held that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Id*. at 1174. In *Stubbs-Danielson*, however, the medical evidence did not establish any significant limitation in the claimant's ability to maintain concentration, persistence or pace. Based on the lack of specific medical limitations, the Ninth Circuit determined the ALJ did not err when formulating a RFC limited to simple and repetitive tasks.

However, in *Brink v. CSS*, 343 Fed. Appx. 211 (9th Cir. 2009), a subsequent unpublished decision, the Ninth Circuit held that when the medical evidence established the claimant had moderate difficulty with concentration, persistence or pace, a limitation to simple repetitive tasks did not adequately address all of the claimant's limitations. The Court found that the hypothetical presented to the VE should have included not only simple, repetitive work, but also Brink's moderate limitations in concentration, persistence, and pace. *Brink*, 343 Fed. Appx. at 212. The holding in *Brink* is consistent with both the Third and the Seventh's Circuit decisions in *Ramirez*

v. *Barnhardt*, 372 F. 3d 546 (3d Cir. 2004) and *Kararsky v. Barnhart*, 335 F. 3d 539 (7th Cir. 2003) which the Ninth Circuit discussed in *Stubbs-Danielson*. Both of these cases found that inclusion of a concentration, persistence and pace limitation in a hypothetical was required when the medical record established deficiencies in these areas. *Ramirez*, 372 F. 3d at 554; *Karasky*, 335 F. 3d at 544; *See also, O'Connor-Spinner v. Astrue*, 627 F. 3d 614, 619 (7th Cir. 2010) (A limitation to simple, repetitive tasks did not account for moderate limitations in concentration, persistence, and pace when the medical evidence established such limitations).

The instant case is akin to *Brink* and the above referenced cases, rather than *Stubbs-Danielson*. Here, the ALJ gave great weight Dr. Acenas' opinion that Plaintiff had moderate limitations in his ability to maintain an appropriate level of concentration, pace, persistence necessary to perform one and two-step simple tasks, as well as complex tasks. Moreover, she clearly rejected Dr. Gauch's opinion that Plaintiff had only fair limitations in the area of concentration and pace. AR 33; 388. Finally, the ALJ memorialized these findings at step three of the disability determination process when she found that Plaintiff had moderate limitations in these areas. AR 28. Although the ALJ's RFC and hypotheticals addressed most of the functional limitations as discussed above, she failed to include Plaintiff's moderate limitations in maintaining concentration, persistence and pace. Therefore, the ALJ's step-five determination is not supported by substantial evidence and is reversible error. AR 71-72; *Bray*, 554 F.3d at 1228 ("If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."); *see also Robbins v. Social Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006) (in posing a hypothetical to VE "an ALJ is not free to disregard properly supported limitations").

Plaintiff argues that this case should be remanded for an award of benefits because after the ALJ's questioning, Plaintiff's attorney presented the VE with a hypothetical that included Plaintiff's moderate limitation in concentration, persistence, and pace in conjunction with the ALJ's identified limitations. In response, the VE indicated that Plaintiff would be precluded from all work. (Doc. 10, pg. 25); AR 73. However, a close examination of the testimony reveals that the VE indicated that Plaintiff would not be able to work as a marker, a mail sorter and a router when presented with the concentration, persistence, and pace limitations; the VE did not testify that Plaintiff would be precluded from all work. AR 73. Furthermore, it is not clear from the

record that a "moderate impairment" which the attorney defined as an inability to perform these tasks for up to one third of the workday is an accurate representation of the limitation. Therefore, the record needs further development in this area before a disability determination can be made, and a remand with benefits is not appropriate. *See*, *Garrison v. Colvin*, 759 F. 3d 995, 1021 (9th Cir. 2014) (A court should remand with for an award of benefits when *inter alia*, the record has been fully developed and further administrative proceedings would serve no useful purpose). On remand, the ALJ shall reformulate the RFC to include a moderate limitation in concentration, persistence, and pace to perform one and two-step simple tasks, as well as complex tasks, in conjunction with the limitations already identified. The ALJ shall then pose a hypothetical to the VE that includes all of Plaintiff's identified limitations in the RFC so that the VE can provide testimony on whether there are jobs available in the U.S. economy that Plaintiff can perform.

### C. The ALJ Properly Discredited Plaintiff's Subjective Complaints.

Plaintiff argues that the ALJ's credibility determination was improper because the ALJ did not provide clear and convincing reasons to reject her testimony. (Doc. 10, pgs. 26-29. Doc. 16, pgs. 3-4). The Commissioner contends that the ALJ's credibility determination was proper and the decision is supported by substantial evidence. (Doc.14, pgs. 11-14).

A two-step analysis applies at the administrative level when considering a claimant's credibility. *Treichler v. Comm. of Soc. Sec.*, 775 F. 3d 1090, 1098 (9th Cir. 2014). First, the claimant must produce objective medical evidence of his or her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id*. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her symptoms only if he or she makes specific findings and provides clear and convincing reasons for doing so. *Id*.; *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.").[10] Factors an ALJ may consider include: 1) the

---

[10] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935 (March 16, 2016) and 2016 WL 1131509 (March 24, 2016). In Ruling 16-3p, the SSA stated it would no longer use the term credibility when evaluating the intensity, persistence and limiting effects of a claimant's symptoms. 2016 WL 1020935, at *14167. It is unclear whether this new rule applies to cases completed prior to the March 28, 2016 effective date. Currently, only the Seventh Circuit has issued a published opinion, applying Ruling 16-3p retroactively. *See, Cole v. Colvin*, 831 F.3d 411 (7th Cir. 2016). But even if the Court were to apply Ruling 16-3p

applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *See Thomas v. Barnhart*, 278 F. 3d at 958-959; *Light v. Social Security Administration*, 119 F. 3d 789, 792 (9th Cir. 1997), *see also* 20 C.F.R. § 404.1529(c).

Because the ALJ did not find that Plaintiff was malingering, she was required to provide clear and convincing reasons for rejecting Plaintiff's testimony. *Brown –Hunter*, 806 F. 3d at 493; *Smolen*, 80 F.3d at 1283-84; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). When there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his or her symptoms solely because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7. Moreover, general findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Brown-Hunter*, 806 F. 3d at 493.

Plaintiff alleged that he was unable to work due to his disabilities. When discrediting Plaintiff's credibility with regard to his psychological condition, the ALJ noted the objective medical evidence did not support the Plaintiff's testimony. AR 31. Specifically, she noted that Plaintiff's mental status examinations were largely normal except for his auditory and visual hallucinations, which as previously discussed, the ALJ found were controlled with medications. AR 31; 47-48; 50; 57. *Warre v. Com'r of Soc. Sec.*, 439 F. 3d 1001, 1005 (9th Cir. 2006) (impairment amenable to control is not disabling). Moreover, the ALJ found that despite Plaintiff's allegations that he was very paranoid and had difficulty with large groups of people (AR 48), he was able to take public transportation, eat in restaurants, volunteer in the community, bring groceries to people's cars, and go shopping by himself. AR 31; 49; 52. She also noted that Plaintiff was able to engage in daily activities including taking care of his personal hygiene, cooking, washing dishes, doing laundry, taking out the trash, watching television and movies, and

---

retroactively, the ALJ's symptom evaluation remains unchanged. Ruling 16-3p changes are not substantive as it relates to this case. *See, Mendenhall v. Colvin*, 2016 WL 4250214, at *3 (C.D. Ill. Aug. 10, 2016) (No. 3:14-CV-3389) ("SSR 96-7p and SSR 16-3p are substantially similar. Rule 16-3p affects only the second step of the method by which symptoms are evaluated.)

exercising. AR 31; 64; 68. These are clear and convincing reasons to reject Plaintiff's testimony. *See Thomas v. Barnhart*, 278 at 958-959; see also 20 C.F.R. § 416.1529(c) (An ALJ can consider inconsistencies either in the claimant's testimony or between the claimant's testimony and his conduct, as well as the claimant's daily activities); *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Given the above, the ALJ provided clear and convincing reasons that are supported by substantial evidence to conclude Plaintiff's subjective symptom testimony was not credible. Here, the ALJ clearly identified what testimony she found not credible and what evidence undermined Plaintiff's complaints. *Brown-Hunter*, 806 F. 3d at 493; *Lester*, 81 F.3d at 834. It is not the role of the Court to re-determine Plaintiff's credibility *de novo*. If the ALJ's finding is supported by substantial evidence, the Court "may not engage in second-guessing." *Thomas*, 278 F.3d at 959. Accordingly, the ALJ's credibility determination was proper.

**VI.**   **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence. Accordingly, this Court GRANTS Plaintiff's appeal in part. The action is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Jason McRoberts and against Nancy A. Berryhill, Commissioner of Social Security, and close this action.

IT IS SO ORDERED.

Dated:   **May 30, 2017**            **/s/ Gary S. Austin**
                             UNITED STATES MAGISTRATE JUDGE